FRANK SPENGER COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF FRANK SPENGER, SR., DECEASED, FRANK SPENGER, JR., EXECUTOR and MARCELLA SPENGER, SURVIVING SPOUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Frank Spenger Co. v. Comm'r
Docket Nos. 8719-77, 8720-77. United States Tax Court
T.C. Memo 1981-156; 1981 Tax Ct. Memo LEXIS 590; 41 T.C.M. (CCH) 1210; T.C.M. (RIA) 81156; March 31, 1981. Robert E. Tout and Thomas *591 P. Brown, for the petitioners. George Mac Vogelei, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in the Federal income tax of petitioners for the taxable year 1972 in these amounts: Docket No.
Petitioner
Deficiency
8719-77
Frank Spenger Co.
$ 61,754
8720-77
Estate of Frank Spenger,
58,730
Sr., Deceased, Frank
Spenger, Jr., Executor,
and Marcella Spenger,
Surviving Spouse
These cases were consolidated for trial, briefing and opinion. After concessions, the only issue we must decide is whether an amount ($ 99,347) received by Frank Spenger, Sr., in 1972 is to be characterized as proceeds from the sale of an interest in property or as dividend income, or, stated alternatively, whether such amount should be included in the income of Frank Spenger Company as an amount realized on the sale of such property. FINDINGS OF FACT Some of the facts herein have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Frank Spenger, Sr. (herein Frank, Sr.), and Marcella Spenger *592 (herein Marcella), husband and wife, filed a joint Federal income tax return for their taxable year 1972 with the Internal Revenue Service Center at Fresno, California. Frank, Sr., died on August 7, 1973. Letters testamentary for his estate were issued to his son, Frank Spenger, Jr. (herein Frank, Jr.), on August 29, 1973, by the Superior Court of the State of California for the County of Alameda. At the time the petition in docket No. 8720-77 was filed, Frank, Jr., and Marcella both resided in Berkeley, California. The Frank Spenger Company (herein the Company) is a corporation organized under the laws of the State of California, having its principal office, at the time the petition in docket No. 8719-77 was filed, in Berkeley, California. The Company, which filed its returns on a calendar year, filed a United States Corporation Income Tax Return for its taxable year 1972 with the Internal Revenue Service Center at Fresno, California. On February 27, 1975, the Company filed an amended return for such taxable year, but such amendment does not affect this controversy. At all relevant times, Frank, Sr., was president and chairman of the board of directors of the Company. Frank *593 and Marcella owned 100 percent of the Company's voting stock and 21 percent of its non-voting stock. Frank, Jr., was the vice president of the Company, and Marcella was its secretary. Sometime in the 1940's, Frank, Sr., and Marcella acquired an 11.37-acre tract of oceanfront land (herein the Point Reyes property) for about $ 11,000. Prior to 1966, Frank, Sr., and Marcella conveyed the entire Point Reyes property to the Company. On August 1, 1966, Frank, Sr., and Marcella, as individuals, leased from the Company a portion of the Point Reyes property consisting of approximately.26 acres (herein the leased tract). The lease envisioned that the Spengers would build a home on the leased tract. The term of the lease was to end on the date of death of the later to die of Frank, Sr., and Marcella. The lease provided for a monthly rental of $ 100. The lessees were to pay all of the taxes and liability insurance on the leased tract, and the lessor was to carry fire insurance on the proposed improvements. These two clauses were also included in the lease: Tenants shall not use said premises for any unlawful purpose, nor violate nor permit to be violated, any federal, state, county *594 or municipal law, ordinance, rule or regulation pertaining to the use or occupancy of said premises, nor commit waste or permit waste to be committed in or upon said premises. In the event that condemnation proceedings are commenced affecting the leased premises, the award obtained in the settlement of such proceedings, voluntarily or by court determination, shall be allocated between Tenants and Landlord as their interests may appear, taking into account the proportion of the expired and unexpired term of the lease, using the average of Tenants' life expectancies to calculate the allocation. Finally, the lease provided that the residence that the lessees intended to build on the leased tract was to become the property of the lessor upon the termination of the lease. Subsequent to entering into the above lease, Frank, Sr., and Marcella built a house on the leased tract at a total cost of $ 141,925.03. Frank, Sr., was born in 1890, and Marcella was born in 1893. In August of 1970, the United States National Park Service, Division of Lands (herein the Park Service), began steps to acquire the Point Reyes property as a part of a proposed national seashore area. The Park *595 Service made several offers to the Company, all of which included a provision whereby the seller could reserve the use of the land for a period of up to 40 years by deducting one percent of the purchase price per year of reservation. During any such period of reservation, the occupants of the property were to use the property solely for non-commercial residential use and in a manner consistent with the policies governing the National Park Service and the applicable rules and regulations thereof. After much negotiation, a purchase price of $ 375,000 was agreed upon. However, the Company desired to reserve the use of the property for 30 years. Thus, the purchase price of the Point Reyes property, subject to such reservation, was $ 262,500. The seller also negotiated this modification to the permitted uses of the property: The reservation of use shall be understood to include all lawful uses carried on for a period of not less than five (5) consecutive years preceding the date hereof, which uses would have been apparent upon any reasonable observation of the subject property. These terms were relayed to the Park Service in a final offer dated January 26, 1972. Frank, Sr., *596 wanted to be reimbursed for the cost of the house he built on the leased tract. Thus, on January 26, 1972, he, Marcella, and the Company entered into an agreement whereby Frank, Sr., and Marcella would receive out of the net proceeds from the sale of the Point Reyes property an amount equal to 70 percent of their costs in building the house. Such agreement was ratified by the Company at a special meeting of the board of directors of the Company. The sale of the Point Reyes property was also authorized at this meeting. The offer to sell was accepted by the United States of America on February 25, 1972. On March 14, 1972, the Park Service issued a check payable to the Marin Title Guaranty Company, escrow agent for the Company, in the amount of $ 262,500. Both the Company and the Park Service instructed the escrow agent to release the funds to the Company upon delivery of a deed into escrow. On April 11, 1972, the Company delivered a general warranty deed to the Point Reyes property to the escrow agent, such deed granting the property to the United States of America subject to a reservation in the grantor for 30 years in accordance with the terms of the January 26, 1972, offer. *597 Upon closing, the escrow agent transferred the $ 262,500 purchase price to the Company, which then paid Frank, Sr., and Marcella the amount due them under the January 26, 1972, agreement, i.e., $ 99,347. At this time, the Company had earnings and profits accumulated after February 28, 1973, in excess of $ 100,000. On its Federal income tax return for 1972, the Company reported the amount realized on the sale of the Point Reyes property as $ 150,653, which amount it calculated by subtracting two amounts from the $ 262,500 received: (1) the $ 99,347 paid to Frank, Sr., and Marcella, and (2) a $ 12,500 legal fee paid to their attorney for the transaction, Mr. Robert E. Tout. The Commissioner determined a deficiency in the Company's Federal income tax for that year based on his contention that the $ 99,347 paid to the Spengers should have been included in the amount realized on the sale of the Point Reyes property. Frank, Sr., and Marcella, on their 1972 Federal income tax return, did not report the amount received from the sale of the Point Reyes property on the theory that their basis in the property was greater than the amount realized, which produced a loss which, because *598 it was attributable to residential property, was not deductible. The Commissioner determined a deficiency in the Federal income tax of these petitioners for their taxable year 1972 on the theory that the amount received by them upon the sale of the Point Reyes property was a dividend from the Company. OPINION The critical question herein is this: to whom was the $ 99,347 payment initially paid? If to the Company, then respondent must prevail; if to the Spengers, then respondent's deficiency determination is erroneous. It is clear from the record that the Park Service paid nothing directly to the Spengers. Gains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer. Sec. 451, Internal Revenue Code of 1954; [1]sec. 1.451-1(a), Income Tax Regs. Since the amount realized from the sale of the Point Reyes property was not actually received by the Spengers, we must see whether it was constructively received by them. Petitioners contend that the $ *599 99,347 should be included in the Spengers' income as an amount realized upon the sale of the Point Reyes property. They argue that the Spengers sold something, and that the allocation of purchase price between the parties was fair. We agree with the former contention, but not the latter. Assuming, arguendo, that the transfer of the fee in the Point Reyes property cut off Frank, Sr., and Marcella's contingent lease rights in the leased property at the end of the 30-year reservation period, [2] then they did transfer some property interest. Our method of determining a fair allocation between the two interests would require a valuation of (1) this leasehold interest in the leased tract which was contingent upon one of the Spengers living until the year 2002, and (2) the rest of the interest in the Point Reyes property. The total fair market value of these two interests should equal $ 262,500, the amount the Park Service was willing to pay for the executory springing interest in the fee simple title to the Point Reyes property which was to commence in 30 years. Suffice it to say that, inasmuch as Frank, Sr., was 82 and Marcella was 79 at the time of the transaction, their interest *600 in the leasehold extending past the 30-year reservation period was probably worth nothing. Mr. Tout as much as admitted this fact when he testified that a 30-year reservation was chosen so as to ensure that the Spengers could live out their lives undisturbed on the leased tract. Moreover, petitioners had the burden of proving any value that could be attributed to this interest, Welch v. Helvering, 290 U.S. 111 (1933), and they have failed to do so. Thus, since we believe that the interest which the Spengers transferred to the government was worthless, no part of the proceeds from the sale can be attributed to such transfer. Petitioners also contend that the terms of the January 26, 1972, offer, which were incorporated into the deed transferring the property to the *601 Park Service, restrict their use of the leased tract, and, therefore, that the amount the Spengers received was compensation for the use restrictions to which they submitted themselves. The only real restriction on the use of the leased tract, after the negotiations which resulted in a provision allowing all uses which had been carried on for at least five years prior to the sale, was that the Park Service could inspect and police the uses of the tract. Petitioners have shown no concrete limitations on their uses of the leased tract, nor the value of any rights relinquished due to the Spengers' submission to any such limitations. Thus, we again find no evidence that Frank, Sr., and Marcella gave anything of value in exchange for the $ 99,347 they received upon the sale of the Point Reyes property. Therefore, the entire amount of the proceeds from the sale of the Point Reyes property should have been included in the gross income of the Company. Having determined that Frank, Sr., and Marcella had no initial right to the disputed $ 99,347, we must characterize the payment of such amount to them by the Company. Under the rules of section 301(a), the payment was clearly a distribution *602 with respect to the stock of Frank, Sr., and Marcella. Since the Comany had sufficient earnings and profits, the distribution was a dividend. Sec. 316(a). Finally, under section 301(c)(1), such dividends should be included in the gross income of the Spengers. Concessions having been made, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. This is probably not the case. Rosenkranz v. Pellin, 222 P.2d 249 (2d Cal. Dist. Ct. App. 1950); Upton v. Toth, 98 P.2d 515 (4th Cal. Dist. Ct. App. 1940). However, if they did not sell this portion of their lease interest, they relinquished nothing other than the right to use the leased property absolutely as they wished, which we will discuss, infra↩.